Dan **MARTEL**, Plaintiff,

v.

The **CITY OF NEWTON, KANSAS**, Defendant.

No. 97–1202–JTM.

United States District Court, D. Kansas.

May 20, 1998.

Cortland E. Berry, Reading, KS, for Dan Martel.

Robert D. Myers, Myers Law Offices, Chartered, Newton, KS, James S. Pigg, Fisher, Patterson, Sayler & Smith, Topeka, KS, for City of Newton, KS.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

The present case arose after the City of Newton, Kansas commenced a civil action in Harvey County District Court to enforce anti-nuisance ordinances against Samuel and Blanche Froelich. Plaintiff Dan Martel states that he was in the business of purchasing and refurbishing real property, and that he had an expectation of buying and selling property of the Froelichs. Martel contends that the City commenced its action against the Froelichs without probable cause and to harass Ms. Froelich. Martel contends the action constitutes a tort of outrage, deprives him of due process, equal protection, and represents an unreasonable restraint of trade under the Sherman Antitrust Act. 15 U.S.C. § 1. For the reasons identified herein, the court hereby grants the City's Motion for Summary Judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Martel is self-employed in the business of remodeling and selling houses. He has no employees, but subcontracts all work to be done.

The Froelichs owned 26 houses or parcels of real property in Newton. Because Samuel Froelich was in poor health, he had difficulty maintaining these properties, which resulted in complaints to the City. Martel approached Froelich in the fall of 1995, and proposed remodeling Froelich's properties and selling them. Although he was initially reluctant, Froelich agreed to the proposal in early 1996.

Martel has conceded that the Froelich properties were a "thorn in the city's side," meaning that they were in a deteriorated or dilapidated condition. The City had filed several complaints against the Froelichs in Municipal Court for nuisance ordinance violations which resulted in guilty pleas or convictions. The Froelichs had received numerous notices from the City regarding violations of city ordinances. Martel cannot identify any other owner having more properties in violation of the Newton nuisance ordinances than the Froelichs.

The first property of the Froelichs which Martel began to remodel was 413 W. Fourth, which at the time was not in a liveable condition. Martel agreed to pay the Froelichs $6000 for the property, to be paid upon the subsequent closing when the property was sold after remodeling. Martel remodeled the

house at a cost of about $15,000, and sold it for $28,400, making a profit of $8,273.00.

The second and third properties remodeled by Martel were a duplex at 308/310 E. Fifth and a house at 424 N. Walnut. Martel agreed to pay the Froelichs $12,000 and $18,000 for the properties, respectively, payable at the time of closing when the properties were sold.

On August 28, 1996, the City filed a petition in Harvey County District Court against the Froelichs, asserting that nine of their properties violated nuisance provisions in the city code. The petition asserted that the City had given numerous notices, and that the Froelichs had made only superficial repairs, with the properties continually falling back into disrepair. The City sought an injunction compelling the Froelichs to bring the properties into compliance with the city code. The petition also sought, in the event the Froelichs failed to comply with the requirements of an injunction, that the City be permitted to repair the properties and obtain judgment for the amount of its expenses.

Martel concedes the nine properties were in violation of the nuisance ordinances.

The Froelichs were represented in the nuisance action by Bill Brown. Martel went with Blanche Froelich to see Brown after learning of the nuisance action. Martel was concerned about the effect of the lawsuit upon his ability to transfer the Froelichs' properties. Brown told them that he would see whether the City would provide lien releases on properties to be sold.

On September 9, 1996, Brown wrote by fax to city attorney Robert Myers, stating that Froelich would like to arrange for sale at auction of four properties, and that three other properties were in the final stages of disposal. Brown asked Myers to agree that if the properties were sold, the City would "agree to release, on a property by property basis, any judgment lien that your lawsuit may pose that would prevent a closing."

Myers wrote the next day that the City did not intend "to create any title problems for your clients," but that it did intend "on getting each of these properties into compliance with city ordinances and regulations, and if a sale of a property would help accomplish that then we are certainly willing to be coopera-

tive." (Martel Dep. Exh. 19). Myers then asked Brown to share the details of the proposed dispositions of the properties, stating he would "do all that I can to cooperate with you to the end that both our client's needs are satisfied." (Id.).

On October 9, 1996, Myers again wrote to Brown:

> The City does not intend to stand in the way of any legitimate, arms-length sales of your clients' properties and we are willing to execute lis pendens releases as to any such sale. I simply need to verify that any such sale is indeed a legitimate, arms-length sale.
>
> Thus, I propose, as to any such sale, that I be provided a copy for my review of any pertinent sales contract documents. Upon my being satisfied that this is a legitimate, arms-length sale, I will execute a lis pendens release specific as to that sale and delivered to the closing agent to be recorded only as a part of the closing.

(Martel Dep. Exh. 21).

Under the City's proposal, once Martel supplied a contract for sale of the properties after repair, the City would provide a lien release. Brown would hold the lien release until the day of the proposed closing and would deliver the release directly to the title company to clear title before closing with the buyer.

Although Martel contends that he had to wait many weeks to receive lien releases, the uncontroverted facts establish that the delay was either not significant, or in any event was not the fault of the City. Brown, the only person who was in direct contact with the City, testified that the City always promptly provided releases upon request.

Martel contends that, at the time the nuisance action was filed, he had reached an agreement in principle to buy all but two of the Froelich properties. At that time however, he had only reached an agreement as to the purchase price of three properties.

Martel entered into other contracts to purchase properties of the Froelichs after becoming aware of the City's nuisance action. The fourth Froelich property with which Martel was involved was 1009 E. Seventh.

This property was not included in the City's nuisance action, and the City did not delay the sale of the property to the final buyer. The fifth property was 509 S. High. This property was also not listed in the City's petition. Martel entered into a contract for the purchase of 509 S. High on October 1, 1996. Although the property had not sold by the time of Martel's December 23, 1997 deposition, the City had already prepared a release which was being held by Brown.

The sixth property was 619 E. Eighth. Martel could not find a contract showing when he entered into an agreement with Froelichs on the property. He sold it by a contract dated November 27, 1996. The sale closed on January 10, 1997 and the City provided a lien release. Martel expressly admits in his deposition that he suffered no loss as a result of the City's petition.

The seventh property was 205 E. Third. Martel entered into a contract with the Froelichs on October 2, 1996. This was one of the properties which Ms. Froelich attempted to sell at auction. Martel agreed, however, to pay $10,000, when the highest bid was $7500. Martel sold this property on December 15, 1997. Martel does not claim any loss relating to this house.

Two other Froelich properties, 224 E. Second and 114 W. Ninth, were sold by the Froelichs at auction. Martel was not interested in purchasing those properties because they were "too far gone and they were not cost effective." (Martel Dep. at 76). Martel has not been involved with other Froelich properties, but is waiting until he secures sufficient money to begin work on them. None of the contracts that Martel has entered into with the Froelichs to acquire any interest in their properties have been publicly recorded.

Martel conceded in his deposition that he has no evidence that the current City Council initiated the nuisance action out of any irritation or ill will towards him. In his response, Martel states that a member of the Council referred to him as a "rabble-rouser" because of his forming a protest group concerning tax reappraisal, but this person is no longer on the City Council. Martel specifically agrees in his deposition that he does not "have any reason to believe that the City filed the petition against the Froelichs because they were mad" at him. (Martel dep. at 124–125).

Martel is white. He has no reason to believe that the City created problems because of his race, age or sex. He has undergone no psychiatric treatment and has felt no need for counseling.

Brown has conceded that a four to six week delay occurred in getting one release to Martel, but has acknowledged that this was the result of delays in his office in providing legal descriptions, not due to any delay by the City.

### Conclusions of Law

As noted earlier, the plaintiff Martel has raised claims for abuse of process, interference with contract and prospective business relationship, outrage, violation of equal protection and due process rights, and violation of the Sherman Antitrust Act. In his response to the City's summary judgment motion, Martel has disavowed his claim for the tort of outrage. The court finds that the remaining claims of Martel are without merit and will be dismissed on the merits.

■ Martel's claim for abuse of process will be dismissed for four reasons. First, the claim has been advanced prior to the resolution of the underlying nuisance action, and is therefore premature. *See Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980) (civil malicious prosecution claim requires proof of earlier action "terminated in favor of plaintiff").

■ Second, Martel has no standing to assert the abuse of process claim, which requires proof that the defendant "initiated, continued, or procured civil procedures *against the plaintiff*." *Nelson*, 227 Kan. at 276, 607 P.2d 438. Here, the state nuisance action was initiated against the Froelichs, not Martel. The tort of abuse of process does not provide or implicate an indiscriminate right of third persons, indirectly affected by a prosecution, to separately advance an abuse of process claim. *See Swanson v. Bixler*, 750 F.2d 810 (10th Cir.1984).

■ Third, Martel has failed to demonstrate that the institution of the civil nuisance action was "improper," *Lindenman v. Um-*

*scheid,* 255 Kan. 610, 875 P.2d 964 (1994), or was undertaken with "malice." *Nelson,* 227 Kan. at 276, 607 P.2d 438. To the contrary, Martel has conceded that the Froelich properties were a "thorn in the side of the city." He has conceded that Froelich properties violated the City's antinuisance ordinances. He has not controverted with admissible evidence the City's factual statement, which demonstrates that the City sent repeated notices to the Froelichs, and that only cosmetic, temporary changes were made in response to these notices. In his responsive brief, Martel has produced no evidence that the properties listed in the nuisance petition in fact were in compliance with City ordinances.

Fourth, Martel has failed to demonstrate that in the nuisance action the City committed "an act ... not proper in the regular prosecution of the proceeding." *Porter v. Stormont–Vail Hosp.,* 228 Kan. 641, 646, 621 P.2d 411 (1980), (quoting *Welch v. Shepherd,* 169 Kan. 363, 366, 219 P.2d 444 (1950)). Citing various cases dealing with injunctive relief generally, Martel argues the City improperly sought injunctive relief in the nuisance action. The argument that the City's request for injunctive relief was premature or that it was required to first pursue a remedy at law is wholly without merit. The Kansas legislature has explicitly authorized, without the attachment of preconditions or qualifications, municipalities to enjoin nuisances. K.S.A. 13–1417.

■ The court will also grant summary judgment on the plaintiff's claims of interference with contract and prospective business relations. These claims fail since the uncontroverted facts establish that the City's nuisance action was not undertaken "without justification" or was the product of "intentional misconduct" by the City. *See Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986). As noted earlier, Martel has provided no evidence that in instituting the nuisance action, the City was acting with any personal or vindictive motive. Rather, the admissions by Martel that the Froelich properties were substandard is equally fatal to his contractual interference claims.

■ Martel's state tort claims accordingly are dismissed on the merits. Inde-pendently, these claims will be dismissed pursuant to K.S.A. 12–105(b), which requires notice of claim as a condition precedent to litigation against a municipal entity. The statute serves the purpose of providing "a municipality an opportunity to review and investigate tort claims against it and to approve or deny such claims before having to litigate an action under the KTCA." *King v. Pimentel,* 20 Kan.App.2d 579, 890 P.2d 1217 (1995). Martel argues notice has in fact been given and that he should be allowed to amend the complaint to show that notice has been given, but amendment will not be permitted at this late date. In any event, giving notice after bringing a lawsuit defeats the purpose of, and will not be deemed to meet the requirements of, the statute. *See Tucking v. Board of Com'rs of Jefferson County,* 14 Kan.App.2d 442, 796 P.2d 1055 (1990) (statute requires substantial and minimal performance).

■■ The court will also grant summary judgment as to the plaintiff's federal constitutional claims. Martel's equal protection claim fails since he fails to demonstrate improper, discriminatory action by the City against the Froelichs as opposed to other similarly situated persons. Martel argues that some individual properties in Newton were in worse shape that some of the properties held by the Froelichs. Critically, however, Martel admits that he has no evidence that there is any other owner of property in Newton who has so many consistently substandard properties. The City's action in initiating a nuisance action against the owners of so many offending properties does not constitute a violation of equal protection, but rather reflects a rational effort to obtain the legitimate goal of protecting the health and welfare of its citizens. Martel's due process claims must be rejected since, even assuming his general, unrecorded agreements with the Froelichs is a property right, he has failed to demonstrate any action by the City which deprived him of those rights. Martel has failed to prove any specific loss. Moreover, to the extent that any delay occurred in processing lien releases, the uncontroverted facts establish that such loss was the product not of the City's action but by counsel for the Froelichs.

■] Finally, Martel's antitrust claim cannot stand since the City in instituting the nuisance action was exercising powers specifically granted by the State of Kansas. *See Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111, 1120 (10th Cir.1991). As noted earlier, municipalities are specifically empowered under Kansas law to enjoin nuisances within their boundaries. Summary judgment will be granted as to the plaintiff's Sherman Act claim.

IT IS ACCORDINGLY ORDERED this 20th day of May, 1998, that the defendant's Motion for Summary Judgment (Dkt. No. 26) is hereby granted.